IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| SHEIDA HUKMAN | : | CIVIL ACTION |
|---|---|---|
| v. | : | No. 17-741 |
| US AIRWAYS/AMERICAN AIRLINES, et al. | : | |

**MEMORANDUM**

**Juan R. Sánchez, C.J.**　　　　　　　　　　　　　　　　　　　　　　　　　**March 25, 2019**

      Pro se Plaintiff Sheida Hukman brings this action under Title VII of the Civil Rights Act of 1964 (Title VII) against Defendant American Airlines, Inc. (American)[1] alleging American discriminated and retaliated against her based on her national origin while she was employed with the airline. The parties have filed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.[2] For the reasons set forth below, the Court will grant American's motion for summary judgment and deny Hukman's motion for summary judgment.

---

[1] Hukman's claims were originally styled against US Airways/American, whose corporate name is American Airlines, Inc.

[2] In addition to her motion for summary judgment, Hukman has also filed a motion for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b)(2). Pursuant to Rule 60(b)(2), a party may move for relief from a final judgment or order on the grounds of newly discovered evidence. However, because no judgment has been entered in this matter and because American has responded to Hukman's motion, the Court will construe Hukman's motion as supplemental briefing in support of her motion for summary judgment.
      Hukman has further moved to strike American's response to her Rule 60(b) motion as untimely. Hukman filed her Rule 60(b) motion on October 23, 2018. Pursuant to Local Rule of Civil Procedure 7.1(c), American had 14 days, or until November 6, 2018, to respond. American responded on November 6, 2018. Therefore, American's response is timely, and the Court will deny Hukman's motion to strike.

**FACTS**[3]

Hukman identifies as a Middle Eastern female of Kurdish descent from Iraq. On May 22, 2007, Hukman began employment with American as a customer service agent at the American service desk at the Las Vegas Airport in Las Vegas, Nevada. In January or February 2010, Hukman was transferred to the Philadelphia airport, where she spent the remainder of her time employed with American until her suspension in 2012. At all times during her employment with American, Hukman was represented by the Airline Customer Service Employee Association—Communications Workers of America and International Brotherhood of Teamsters (the Union), which operated under a Collective Bargaining Agreement (CBA) between American and Hukman's union representatives. The CBA governed the terms and conditions of employment for union members, including Hukman, and consisted of multiple Articles defining specific policies and procedures.[4] Additionally, at all times during Hukman's employment, American had in place non-discrimination and anti-harassment policies, which required employees to report any perceived discrimination or harassment to either a supervisor or American's Human Resources department.[5]

During her employment as a customer service agent, Hukman attempted multiple times to obtain a promotion to a customer service supervisor (CSS) position. Pursuant to Article 9.D of the

---

[3] In evaluating a motion for summary judgment, a court must "view the facts in the light most favorable to the non-moving party and must make all reasonable inferences in that party's favor." *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). The facts presented herein are undisputed.

[4] These Articles relate to policies and procedures such as supervisor premium pay (Article 5); seniority-based promotions, transfers, and recalls (Article 8); vacancies (Article 9); employer-mandated independent medical evaluations (Article 16); and language premium pay (Article 16).

[5] On or near the beginning of Hukman's employment, she was presented with a policy acknowledgement form signifying she received and reviewed these policies. *See* American's Statement of Undisputed Material Facts Ex. 4.

CBA, American was required to follow a CSS qualification process that set forth specific guidelines with respect to the application, scoring, and interview process for these positions. As part of this process, an applicant is required to complete two separate forms indicating his or her desire to work as a CSS. Upon receipt of these forms, a manager completes an Applicant Rating Form (ARF), which is not shared with the applicant. *See* American's Statement of Undisputed Material Facts Ex. 34. Once an ARF form is completed, the applicant is scheduled for a panel interview. *See id.*

On January 17, 2011, Hukman applied for an open CSS position. Manager Gary Shepherd completed an ARF for Hukman and gave her a perfect score but did not provide any reason for his score. Two days later, Shift Manager Nina Bengivengo informed Shepherd he needed to provide an explanation for giving Hukman a perfect score and that all CSS packets must be approved by a duty manager or another manager. Because no explanation was provided, Shift Manager Angel Rosario completed a second ARF for Hukman. This time, Hukman did not receive a perfect score and was rated "below expectations" in teamwork/collaboration, leadership, adaptability, and communication. *Id.* Ex. 39.

Pursuant to American's policy, Hukman did not see either ARF. Hukman subsequently complained she was not treated fairly during the application process and demanded to see her ARF. Customer Service Director Ken Fischer, Senior Manager Peter O'Kane, and Duty Manager Madaline McCune met with Hukman, explained the CSS process and how no applicants were provided with their ARF. *See id.* Ex. 40-41. Hukman expressed discontent with this process, withdrew her CSS application, and was removed from the panel interview list.

In April 2011, Hukman changed her mind, resumed the CSS application process, and was scheduled for a panel interview on May 19, 2011. Two days prior to the interview, Hukman canceled her interview, indicating she was not available. American rescheduled her interview for

3

June 9, 2011. On that day, Station Manager Jerry Mallet and CSS Herbert Cole interviewed Hukman. In accordance with the CSS application process, neither Mallet, nor Cole had previously known Hukman. At this interview, despite being asked numerous follow-up questions, Hukman failed to adequately answer, or failed to answer at all, questions regarding her ability to work with difficult co-workers and adapt to different situations, and her technical knowledge. *Id.* Ex. 47. Hukman's panel interview was below the threshold score required to be promoted to a CSS position. Thus, Hukman was ineligible to be promoted to a CSS position and would need to wait one year before reapplying pursuant to the CBA. *See id.* Exs. 36, 47.

Shortly after learning she would not be further considered for the CSS position, Hukman submitted a handwritten complaint asserting she was "not treated right" during her panel interview and improperly asked, "where do you come from[,] tell us[?]" during the interview. *Id.* Ex. 49. American initiated an investigation into Hukman's complaint. Mallet submitted a letter to American in response, stating he and Cole asked the question to elicit her prior work experience pursuant to the CSS interview guide, and Hukman volunteered she was a "Kurd who grew up in Spain." *Id.* Ex. 47. Mallet further noted that after this response, he informed Hukman he was looking for information about her prior employment experience because he did not receive a resume from her. *Id.* On July 21, 2011 Human Resources Manager Robert Yori informed Hukman American could not substantiate her allegation and explained to her the intent of the question was to elicit her employment history.

On June 19, 2012, Hukman applied for another open CSS position. International Duty Manager MaryAnn Rinderer completed an ARF for Hukman. Rinderer rated Hukman at the lowest possible rating for teamwork/collaboration and rated her "below expectations" in leadership, adaptability, communication, and impact. American's Human Resources department attempted to schedule a CSS panel interview with Hukman, but she declined the request. Hukman subsequently

4

complained to Yori she was not scheduled for a panel interview in violation of the CBA. Yori instructed Hukman to file a grievance pursuant to the CBA. On September 27, 2012, American's Human Resources department scheduled Hukman's interview for October 4, 2012, but Hukman canceled her interview. Consequently, Hukman was not further considered for the open CSS position.

In addition to seeking promotion to a CSS position, Hukman also made multiple requests to transfer from the Philadelphia airport to other airports American serviced. Under Article 9 of the CBA, employees are permitted to submit as many transfer requests to as many cities as they wish, and any pending transfer request remains valid for one year. When a transfer is offered, an employee has until 5:00 p.m. the following day to respond. If the employee cannot be contacted and does not have a proxy on file, the employee is bypassed and considered to have refused the transfer offer. Once an employee "refuses" a transfer offer, any pending transfer requests are purged. Pursuant to Hukman's requests, American offered Hukman three transfers during the course of her employment.[6] First, on February 22, 2012, American offered Hukman a transfer to Washington, D.C., which she refused by failing to timely respond. Second, on March 19, 2012, American offered Hukman a transfer to Charlotte, North Carolina, to which she again failed to respond. Finally, on September 17, 2012, American offered Hukman a transfer to Tampa, Florida. Hukman initially accepted the offer but later rejected the transfer. Because she refused the offered transfers, Hukman was never transferred from the Philadelphia airport.

Throughout her tenure with American, Hukman also had several confrontations with her co-workers. Beginning in May 2011, Hukman made several complaints alleging her co-worker

---

[6] Hukman also submitted transfer requests to Phoenix, Arizona and San Diego, California on September 28, 2015, and October 20, 2015. American did not consider these requests because, as explained below, Hukman was on leave pending the completion of the return-to-work conditions imposed pursuant to an independent medical examination.

Laura Williams-Anderson was stalking her, working with the CIA to tap her phones, and spreading rumors. Yori met with Hukman regarding her complaints about Williams-Anderson and asked her to prepare a written statement. In response, in June 2011, Hukman provided Yori with a series of handwritten notes, asserting she had been harassed by various employees between late 2010 and mid-2011. Hukman also claimed her co-worker Kevin Bailey prepared a petition, which stated "Sheida Hukman should not be in the hub. She should get fired and sent back to Phoenix or wherever she came from." *Id.* Ex. 8. Hukman never saw this petition but claims an unnamed union representative and manger told her about it. Upon learning of Hukman's complaints, Yori engaged Senior Manager Renee Teran to investigate.

Teran interviewed several witnesses regarding Hukman's complaints and determined a majority of the complaints could not be substantiated. However, Teran's investigation found Bailey had authored a petition requesting Hukman be fired and circulated it to certain crew members in Philadelphia. Mot. for Relief Under Rule 60 Ex. B at 3-4. In an interview with Teran, Bailey informed her the purpose of the petition was to have Hukman removed from the station. *Id.* at 4. However, after Shop Steward Nicole Blanchard informed him he could not initiate a petition against another employee, Bailey disposed of the petition. *Id.* at 3. Teran did not obtain a copy of, or see, Bailey's petition.

At the conclusion of her investigation, Teran followed up with each person to whom she had spoken with during the investigation, stating the results of her investigation and reminding each of American's policies against discrimination, harassment, and retaliation. Yori also communicated the results of the investigation to Hukman. Yori informed Hukman that, while some sort of petition was circulated, the petition had no effect on determining Hukman's work status and stated American took "appropriate action to inform all parties involved in the investigation that such action is inappropriate and unacceptable behavior." American's Statement, Ex. 12.

6

In another incident, on June 20, 2012, Hukman filed a written complaint with American's Human Resources department alleging her co-worker Debbie Zanikos accused her of "delivering drugs, questioning [her] [f]inance[s], giving [out her] personal information, and asking agents to [spy on her]." *Id.* Ex. 14. Zanikos filed a written response to Hukman's complaint asserting Hukman had initiated an altercation with her on May 12, 2012, by entering the staff breakroom, accusing Zanikos of talking about her, and threatening to sue Zanikos. *See id.* Ex. 15.

Three months later, on September 11, 2012, Hukman sent another written complaint to Yori stating the break and locker rooms were bugged, she was being stalked by a co-worker who wanted to murder her, and employees "have their own [witch] language . . . (reverse language)" and a witch was fabricating accusations against her.[7] *Id.* Ex. 16. Approximately two weeks later, Hukman complained to Senior Manager Patrick Lewis that someone was accessing her work computer systems, changing her passwords and language preference, and gate terminals were being "monitored." *Id.* Ex. 17. When Lewis pressed Hukman for more information about who was committing the alleged acts, she told him the wrongdoers were employees, but refused to provide Lewis with any names.

Hukman's issues with her co-workers came to a climax when she had a verbal altercation with a pilot and flight attendant attempting to board a flight on travel privileges. On November 15, 2012, Hukman was working the gate for a departing Republic Airlines (Republic) flight. After she boarded passengers paying for the flight, Hukman boarded passengers flying on travel privileges. When a Republic flight attendant—who had a boarding priority under Republic's corporate policy—attempted to board the plane, Hukman refused to let her board. The flight attendant and a Republic pilot accompanying her reminded Hukman of Republic's policy. Hukman stated she

---

[7] Hukman disputes authoring the September 11, 2012, letter but acknowledged the signature on letter was in her handwriting. American's Statement Ex. 2 at 222-23.

understood Republic's policy but refused to allow the flight attendant to board. At this point, Hukman began yelling at the flight attendant and the pilot in front of other passengers boarding the flight and reported the pilot to the air traffic control tower.

As a result of the incident, American conducted an investigation. On November 21, 2012, while the investigation was pending, an anonymous employee contacted American through its compliance hotline regarding Hukman. *See id.* Ex. 25. The unidentified employee described Hukman's behavior as "irrational," reported Hukman "ma[de] up situations in her head" about other employees, stated she believed Hukman suffered from a "mental disorder," and was worried for her safety because she did not know what "[Hukman] is capable of." *Id.* The investigation into the November 15, 2012, incident concluded both Hukman and the pilot acted unprofessionally during the incident.

American decided to issue Hukman a "Performance Level 1" disciplinary letter, the lowest severity form of written discipline. Senior Customer Service Manager Eric Staples set a meeting for December 2, 2012, to deliver the disciplinary letter. On that day, Hukman entered the meeting room screaming and accused Staples of trying to turn the airport against her. Hukman refused to take any responsibility for the November 15, 2012, incident, stating it was a "set up" concocted by her co-workers, Williams-Anderson and Blanchard, to have her fired.

Following the December 2, 2012 meeting, Staples and other managers had concerns regarding Hukman's mental health given her behavior during the meeting and history of altercations with her co-workers. On December 4, 2012, Hukman's fellow employee Jane Gallina complained about Hukman accusing her of "tapping" her cellphone at the direction of the FBI to listen to her conversations and made false accusations and derogatory comments about her. *See id.* Ex. 26. On December 10, 2012, American's Human Resource department and a union representative informed Hukman she would need to undergo an independent medical exam (IME)

and complete any return-to-work conditions per Article 16 of the CBA. *See id.* Ex. 27. Hukman was provided a letter confirming these requirements and suspended pending completion of the IME and return-to-work conditions. *See id.* Ex. 27.

Hukman initially refused to participate in the IME and sought to schedule it on her own terms with her own doctor. Despite these attempts, on January 18, 2013, Hukman eventually saw Dr. Karen Cruey, an independent medical doctor with a specialty in psychiatric medicine, at the direction of American. After meeting with Hukman, Dr. Cruey determined Hukman could not effectively and safely perform her job functions, and needed to obtain mental health treatment in the form psychotherapy as a return-to-work condition. *See id.* Ex. 31. Dr. Cruey believed this treatment would help Hukman overcome the issues she was having with her co-workers.

On February 20, 2013, American informed Hukman of Dr. Cruey's findings and that she must complete psychotherapy to return to work. American further informed Hukman she could "appeal her removal from service as a result of the IME by employing a medical examiner of her choice, at her own expense, to conduct an examination of the same issues addressed by [Dr. Cruey]." *Id.* Ex. 32. Hukman took no action to appeal Dr. Cruey's findings and made no attempt to obtain psychotherapy. On December 10, 2015, three years after being suspended from service and having failed to complete psychotherapy, Hukman was terminated from her employment with American. *See id.* Ex. 33.

In response to the above-listed events, Hukman filed numerous administrative charges with the Equal Employment Opportunity Commission (EEOC).[8] On August 31, 2011, Hukman filed

---

[8] In May 2013, Hukman also filed a charge with the Occupational Safety and Health Administration (OSHA) alleging American allowed its employees to smuggle people, including fugitives, onto aircrafts without reporting them on the flight manifest, which posed a significant safety issue with respect to weight and balance. Hukman claimed a person known to her as "the Iranian" established a school to teach invisibility and co-workers were using it to improperly board

9

her first charge alleging national origin discrimination relating to her 2011 CSS application. On June 7, 2012, Hukman filed a second charge of discrimination alleging national origin discrimination and retaliation in regard her 2012 CSS application and altercation with Zanikos. Approximately six months later, Hukman filed a third charge alleging retaliation in response to her suspension following the November 12, 2012, incident. On June 2, 2016, Hukman filed a fourth charge alleging American retaliated against her by "setting her up" for the IME and termination in response to her previous EEOC charges. *Id.* Ex. 73. On November 29, 2016, the EEOC dismissed Hukman's charges and issued her a Dismissal and Notice of Rights letter.[9] *See id.* Ex. 75.

Hukman commenced this action on February 16, 2017. Hukman initially brought her Complaint against Republic Airways Holdings, Inc. and several individual employees of the airline, in addition to American. At this point in the proceedings, all defendants except American have been dismissed. In her Amended Complaint, Hukman alleges American discriminated, harassed, and retaliated against her by (1) failing to promote her to a CSS position; (2) failing to pay her a supervisor's premium rate and language premium for announcements made in Spanish; (3) refusing to prevent employee discrimination and harassment; (4) failing to transfer her; (5) failing to recall her to her previous airport in Las Vegas; and (6) orchestrating her termination by suspending her and forcing her to take a medical examination without justification.[10]

---

aircrafts. In May 2018, Administrative Law Judge Lee J. Romero, Jr., issued a summary decision in favor of American and dismissed Hukman's complaint.

[9] The EEOC disposed of Hukman's three previous charges earlier but mailed the Notice of Rights letters to an incorrect address. Thus, the EEOC reissued the letters with updated dates. *See id.* Ex. 74.

[10] Hukman also sets forth claims alleging American interfered with her subsequent employment with Berkshire Hathaway Homeservices Nevada Properties and Southwest Airlines, impeded her efforts to obtain employment with Delta Airlines, and disrupted her personal life in violation of Title VII. These claims, however, will not be further addressed as Hukman did not raise these issues in any of her charges of discrimination with the EEOC and has therefore failed to exhaust

## DISCUSSION

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material" facts are those facts "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the [non-moving] party." *Id*.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation and internal quotation marks omitted). To defeat summary judgment, "the non-moving party must present more than a mere scintilla of evidence; there must be evidence on which the jury could reasonably find for the [non-movant]." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (alteration in original) (citation and internal quotation marks omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). Where, as here, cross-motions for summary judgment are filed, "the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard*." Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016)

---

her administrative remedies. *See Mandel v. M & W Packaging Corp.*, 706 F.3d 157, 163 (3d Cir. 2013) (holding plaintiff must exhaust all administrative remedies before bringing a Title VII claim).

(alteration omitted) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 (3d ed. 1998)).

American first contends the Court lacks subject matter jurisdiction over Hukman's claims because they require interpretation of the CBA and are therefore precluded by the Railway Labor Act, 45 U.S.C. § 151 et seq. (RLA).[11] American's argument is unpersuasive because the RLA does not preclude causes of action arising under federal statutes independent of a CBA, such as those based on "purely factual questions about an employee's conduct or an employer's conduct and motives." *See Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 256 (1994). Here, Hukman's claims are primarily concerned with American's motives in undertaking the claimed discriminatory actions and its use of discretion. *See, e.g.*, *Ellis v. Nat'l R.R. Passenger Corp.*, No. 02-8059, 2004 WL 257392, at *3 (E.D. Pa. Feb. 11, 2004) (collecting cases). Therefore, the RLA does not preclude Hukman's claims. Nevertheless, Hukman's claims fail.

Turning to the substance of Hukman's Title VII national origin discrimination claims, because Hukman presents no direct evidence of national origin discrimination, the "*McDonnell Douglas* burden shifting analysis applies to [her] claims . . . ." *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under this framework, Hukman bears the initial burden of establishing a prima facie case of discrimination. *Id.* at 797 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)). If she establishes a prima facie case of discrimination, the burden shifts to American to articulate a legitimate nondiscriminatory reason for the adverse actions. *Id.* (citing *McDonnell Douglas*, 411

---

[11] Although some courts appear to use the terms "preclusion" and "preemption" interchangeably, "preclusion" is intended to refer to the RLA's effect on federal claims, where "preemption" refers to the RLA's effect on state claims. *See Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 259 n.6 (1994).

U.S. at 802). If American meets this burden, Hukman must show the articulated reasons were pretext for discrimination. *Id.*

To establish a prima facie case under Title VII, Hukman must demonstrate (1) she is a member of a protected class, (2) she is qualified for her position, (3) she suffered an adverse employment action, and (4) the circumstances surrounding the adverse action give rise to an inference of unlawful discrimination. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999). In the context of a prima facie case, "a plaintiff's own assertion of racial animus does not give rise to an inference of unlawful discrimination." *Williams-McCoy v. Starz Encore Grp.,* No. 02-5125, 2004 WL 356198, at *7 (E.D. Pa. Feb. 5, 2004) (citing *Bullock v. Children's Hosp. of Phila.*, 71 F. Supp. 2d 482, 490-91 (E.D. Pa. 1999)).

The parties do not dispute that Hukman is a member of a protected class with respect to her national origin. However, the parties disagree as to whether Hukman has established the remaining elements of a prima facie case of discrimination. Hukman contends she has established a prima facie case of discrimination, while American argues she has failed to establish each of the final three prongs of the *McDonnell-Douglas* test. Without regard to her qualifications and whether American took an adverse employment action against her, the record demonstrates Hukman has failed to proffer evidence creating a genuine issue of material fact as to whether American's actions with respect to her termination, its decision to not promote her to a CSS position, and its decision not to transfer her occurred under circumstances giving rise to an inference of discrimination.

Beginning with her termination, there is no genuine issue of material fact that American's actions were not motivated by Hukman's national origin. The record shows American acted in response to concerns about Hukman's fitness for duty. Hukman alleges American conspired to set up the November 15, 2012, incident to fabricate a reason to send her for an IME and terminate her because of her national origin. Pl.'s Mot. for Summ. J. 8. This argument is meritless as there is no

evidence suggesting the November 15, 2012, incident was a "set up," let alone one orchestrated to terminate Hukman on the basis of her national origin. Although American's investigation concluded both Hukman and the Republic pilot acted unprofessionally, there is no evidence suggesting the Republic pilot initiated the altercation at the direction of American because of her national origin. Hukman cannot survive summary judgment merely by arguing, without more, American "set her up" for termination. *See Evanoski v. United Parcel Serv., Inc.*, 571 F. App'x 92, 96 (3d Cir. 2014) (affirming summary judgment for employer where plaintiff merely speculated about the employer fabricating allegations to support his termination).

Conversely, the record demonstrates American suspended Hukman and referred her for a psychiatric IME due to the November 15, 2012, incident, her disruptive behavior during the investigation process, the November 21, 2012, anonymous tip expressing concern for employee safety and her mental health, and her previous complaints and altercations with her co-workers. The IME conducted by Dr. Cruey then determined Hukman could not perform her essential job functions safely without obtaining psychotherapy.[12] As a result, Hukman could not return from her suspension until she obtained psychotherapy. Hukman was informed of this condition and her right to appeal Dr. Cruey's findings, but failed to take action and, after three years, was terminated pursuant to American's policy. No evidence exists in the record suggesting Hukman was treated less favorably because of her national origin or that her national origin played any role in American's decision-making process with regard to her termination. *See Sarullo*, 352 F.3d at 798 (noting "[t]he central focus of the *prima facie* case is always whether the employer is treating some

---

[12] Hukman disputes the validity of the IME as she claims American forged documentation provided to Dr. Cruey stating Williams-Anderson was her legal guardian. This assertion has no evidentiary basis in the record.

people less favorably than others because of their . . . national origin" (citation and internal quotations omitted)).

Next, turning to her discrimination claim regarding her applications for a CSS position, Hukman has failed to proffer evidence demonstrating she was not promoted to a CSS position because of her national origin. On the contrary, the record shows American's decision was based on the poor evaluations she received from her supervisors, her poor performance during the interview process, and her failure to follow through with scheduling her panel interview.

The only evidence in the record that could be construed as potentially discriminatory was Cole's comment during the 2011 panel interview where he asked Hukman "where do you come from[,] tell us[?]" American's Statement Ex. 49. However, Mallet clarified this comment referred to Hukman's employment history because he and Cole did not receive a resume with her application, and when she volunteered information regarding her national origin and race, he redirected her to discussing her work experience. *See id.* There is no evidence, other than Hukman's own subjective belief, demonstrating Cole's question was motivated by her national origin. Consequently, there is no genuine issue of material fact that American's decision to not promote Hukman was not discriminatory. *See Williams-McCoy*, 2004 WL 356198, at *7 (holding a plaintiff cannot set forth a prima facie case of discrimination where the only evidence of the claim is the plaintiff's subjective belief).

Hukman's discrimination claims regarding her transfer requests also fail for the same reasons. The record shows American did not transfer her because of reasons unrelated to her national origin. Specifically, the record demonstrates American did not grant Hukman's transfer requests because she either (1) refused the transfer request; or (2) was ineligible for transfer due to being placed on medical leave pending completion of the IME requirements. The only evidence

suggesting an inference of discrimination is Hukman's unsupported, subjective belief, which plainly fails to establish a prima facie case of discrimination under Title VII.[13] *See id.*

Even assuming Hukman set forth a prima facie case of discrimination, American has articulated a legitimate non-discriminatory reason for its actions that Hukman cannot rebut as pretext. As noted, American's actions were based on nation origin-neutral criteria related to either (1) concerns about Hukman's fitness for duty; (2) her failure perform during the CSS interview process; and (3) her refusal of the offered transfers. American is therefore entitled to summary judgment on Hukman's Title VII discrimination claims.

To the extent Hukman alleges American failed to stop her fellow employees from harassing her because of her national origin, the Court construes this as a hostile work environment claim. Title VII prohibits harassment that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). To prevail on a hostile work environment claim, an employee must prove (1) he or she suffered intentional discrimination on the basis of membership in a protected class, (2) the discrimination was severe or pervasive, (3) he or she was detrimentally affected by the discrimination, (4) such discrimination would detrimentally affect a reasonable person in similar circumstances, and (5) the existence of respondeat superior liability. *Mandel v. M & W Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (citation omitted).

---

[13] Hukman also makes claims of discrimination for other miscellaneous incidents that occurred during her employment, alleging she (1) was not paid a language premium for making announcements in Spanish; (2) did not receive overtime supervisor pay when she filled in for supervisors; and (3) was not recalled to the Las Vegas airport while she was on medical leave. There is similarly no evidence of discriminatory animus on behalf of American in regard to these claims.

In this instance, Hukman's claim fails because the acts of hostility she alleges do not rise to the level of severe or pervasive. Over the course of her eight-year employment with American, Hukman alleges three specific instances where she was subjected to discriminatory remarks, including Bailey's petition to remove her from the airport, Williams-Anderson calling her a terrorist, and Zanikos telling another co-worker to be careful of Middle Easterners. Taken as true, these isolated incidents over the course of her eight-year employment fail to prove the alleged discrimination was severe or pervasive. *See e.g., Phillips v. SEPTA*, No. 16-0986, 2018 WL 827440, at *6 (E.D. Pa. Feb. 12, 2018) (holding three incidents of co-worker remarks regarding the plaintiff's national origin and several instances of co-workers stuffing his utility box with toilet paper over the course a four-year employment was insufficient to establish a hostile work environment claim); *Clair v. Agusta Aerospace Corp.*, 592 F. Supp. 2d 812, 822-23 (E.D. Pa. 2009) (holding five incidents where the plaintiff's co-workers expressly mentioned her national origin over the course of a 21-month employment is insufficient to establish a hostile work environment claim). American is entitled to summary judgment on Hukman's hostile work environment claim.

Similarly, Hukman's retaliation claim fails. Title VII prevents an employer from retaliating against an employee for engaging a protected activity. "To be protected from retaliation under Title VII, the protected activity must relate to employment discrimination . . . ." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 792 n.10 (3d Cir. 2016). To establish a retaliation claim under Title VII, Hukman must show (1) she engaged in a protected employee activity; (2) American took an adverse employment action either after or contemporaneous with her protected activity; and (3) a causal connection between her protected activity and American's adverse action. *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (citations omitted). Hukman must prove "but-for" causation, meaning "the unlawful retaliation would not have occurred in the absence of the

alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360-61 (2013). If Hukman establishes a prima facie case, the burden shifts to American to articulate a legitimate, non-retaliatory reason for its adverse employment action. *See Daniels*, 776 F.3d at 193. If American articulates a legitimate, non-retaliatory reason, the burden shifts back to Hukman to show the employer's proffered reason was pretext for retaliation. *See Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007).

Hukman's retaliation claims fail because she cannot establish causation. To prove causation, a plaintiff may (1) point to an "unusually suggestive" temporal proximity between the protected activity and adverse employment action, *Daniels*, 776 F.3d at 193, or (2) "intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action," *id.* at 196. Hukman's alleges American retaliated against her for filing four EEOC charges by wrongfully terminating her, failing to promote her, and failing to correct harassing and discriminatory behavior.

In this instance, Hukman has not provided evidence of causation. Initially, there is no "unusually suggestive" temporal proximity between the alleged retaliatory actions and Hukman's filing of her EEOC complaints. *Cf. Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (reversing summary judgment in favor of the defendant where plaintiff had been discharged two days after his employer's receipt of his EEOC claim). Furthermore, there is no evidence of intervening antagonism by American, or inconsistencies in its stated reasons for terminating or failing to promote Hukman. To the extent Hukman argues American retaliated against her by failing to correct harassing and discriminatory behavior, this allegation is unsupported by the record as American investigated each of her allegations of misconduct and took corrective measures where appropriate. Accordingly, Hukman has failed to establish a prima facie case of

retaliation. *See, e.g., Stone v. Johnson*, 196 F. Supp. 3d 562, 567 (E.D. Pa. 2016) (holding an employee could not establish the causation prong of a retaliation claim where there was no unusually suggestive temporal proximity and there were no inconsistencies in the employer's reasons for not reinstating him when it relied on the opinions of medical professionals who determined he could not perform his duties as an air marshal due to a medical condition).

Even assuming Hukman established a prima facie case, as discussed above in response to her Title VII discrimination claims, American has articulated legitimate non-retaliatory reasons for its actions which Hukman cannot rebut as pretext for retaliation. Because there is no genuine dispute of material fact, American is entitled to summary judgment on Hukman's Title VII retaliation claim.[14]

**CONCLUSION**

For the reasons set forth above, the Court will grant American's motion for summary judgment, deny Hukman's motion for summary judgment, and enter judgment in favor of American on all counts.

An appropriate order follows.

BY THE COURT:

Juan R. Sánchez, C.J.

---

[14] To the extent Hukman alleges American retaliated against her for filing a charge with OSHA in violation of Title VII, this claim is non-cognizable under Title VII because it is tied to her reporting of safety issues and not opposing or reporting discrimination. *See Connelly*, 809 F.3d at 792 n.10 ("[Plaintiff's] other complaints, to the extent they implicated only safety issues, were not protected activity for purposes of her retaliation claim.").

19